IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                                :
DANELLE BOSTROM, et al.,        :      HON. JEROME B. SIMANDLE
                                :
             Plaintiffs,        :      Civil No. 11-1424 (JBS/JS)
                                :
     v.                         :
                                :           OPINION
NEW JERSEY DIVISION OF YOUTH    :
AND FAMILY SERVICES, et al.,    :
                                :
             Defendants.        :
                                :
```

APPEARANCES:

Louis Charles Shapiro, Esq.
SPRAGUE & SPRAGUE
135 South 19th Street
Suite 400
Philadelphia, PA 19103
     Attorney for Plaintiffs Danelle Bostrom, Stephen Bostrom,
     J.B. and J.B.

Paul D. Nieves, DAG
Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, NJ 08625
     Attorney for Defendants Denise Schuh, Tara Broglin, Officer
     (FNU) Torres; and Officer (FNU) McCloy

**SIMANDLE**, Chief Judge:

I.  **INTRODUCTION**

     This matter is before the Court on the motion of Defendants

Denise Schuh, Tara Broglin, Officer (FNU) Torres; and Officer

(FNU) McCloy for summary judgment. [Docket Item 43.]  There is

also a pending unopposed motion for leave to file a sur-reply

and/or strike which was filed in response to Defendants' reply

brief.  [Docket Item 55.]  The Court heard oral argument on both

motions.

The instant action arises out of a search conducted by two New Jersey Division of Family Services ("DYFS") case workers and two Human Services Police officers at Plaintiff Danelle Bostrom and Stephen Bostrom's home at 1:00 AM on December 14, 2006. Specifically, on the evening of December 13, 2006, Defendants McCloy and Torres, Human Services Police officers, located A.B., Plaintiffs' adopted daughter who had runaway from a foster home approximately ten months prior. At the time A.B. went missing and was found, A.B. was in the custody of DYFS and receiving DYFS services because she suffered from mental and social problems and required the services of a therapeutic foster home. A court order had been issued placing A.B. in the custody of DYFS; Plaintiffs' parental rights, however, were not terminated.

Upon locating A.B., Defendants McCloy and Torres transported her to a local DYFS office where Defendants Schuh and Broglin, two after-hours case workers, were called in to handle the situation. Schuh and Broglin looked up A.B.'s information on DYFS's computer system which mistakenly noted that Plaintiffs, not DYFS, had custody of A.B. Schuh and Broglin then contacted the Plaintiffs and the Plaintiffs informed them that DYFS itself actually had custody of A.B. pursuant to a court order and they could not take A.B. into their home. Plaintiffs informed Schuh and Broglin that they had two other minor children, JB1 and JB2,

2

and A.B. posed a threat to them and it was unsafe to let her back into the family home.  Plaintiffs encouraged Schuh and Broglin to take A.B. to a crisis center.

Schuh and Broglin, after exchanging harsh words with the Plaintiffs, told the Plaintiffs that if they refused to take custody of A.B., then their home would have to be searched and their other two children searched for signs of abuse and neglect. Plaintiffs still refused to take custody of A.B.  As a result, Schuh called her supervisor, non-party Joanne Fadool,[1] who allegedly told Schuh that a search of Plaintiffs' home would need to be done after A.B. was placed in foster care, despite the late hour of the evening.  This search was necessary, according to Defendants, to remove A.B. from Plaintiffs' custody.

Schuh, Broglin, Torres and McCloy came to Plaintiffs' home at 1:00 AM on December 14, after they had placed A.B. in a foster home, and searched the residence.  Defendant Schuh and Broglin also served Plaintiffs with a Dodd removal form which officially removed A.B. from Plaintiffs' custody, subject to a prompt judicial hearing.  This search included Broglin and Torres going into JB1 and JB2's respective bedrooms to do a visual assessment of the children to make sure they were breathing and did not have

---

[1] Fadool is not a defendant in this case and there is no record evidence, either an affidavit or deposition, from her. The only evidence of her involvement is Schuh's and Broglin's deposition testimony.

any visible marks or bruises. After concluding the children were safe, Schuh and Broglin informed Stephen Bostrom that Plaintiffs would need to be in court the next day, December 15, as a result of the Dodd removal.

Later that morning, A.B.'s caseworker called the Bostroms and informed them that they did not have to come to court on Friday because DYFS already had custody of A.B. and the Dodd removal was unnecessary.

The Plaintiffs brought the instant action pursuant to Section 1983 alleging violations of the Fourth Amendment, procedural and substantive due process and the First Amendment. Defendants maintain that it was DYFS's policy to conduct a home search when a minor was removed from the household and other minor children continued to reside at the household. The Defendants argue that they were mistaken about A.B.'s custody and this mistake was at most negligent. The Defendants do not argue that there were any allegations of child abuse by the Plaintiffs with regard to JB1 or JB2 or that they had any reason to believe that JB1 or JB2 were in imminent danger. It is undisputed that the catalyst for the home search was the Plaintiffs' refusal to let A.B. into their home and Plaintiff Stephen Bostrom's purportedly hostile tone when discussing the situation with Defendant Broglin over the phone.

Defendants now move for summary judgment. Defendants argue

that the evidence does not support Plaintiffs' constitutional claims and alternatively, Defendants argue they are entitled to qualified immunity.  Plaintiffs oppose Defendants motion and also move to strike portions of Defendants' reply.

## II.   BACKGROUND

### A. Statement of the Facts

The following is a detailed factual background of the case. These facts are viewed in the light most favorable to the Plaintiffs, as the non-moving parties on this motion for summary judgment.

Plaintiffs Stephen and Danelle Bostrom are the adoptive parents of A.B. and have two biological children, JB1 and JB2. (Pls.' Ex. B, Deposition of Stephen Bostrom, taken on December 1, 2010 (hereinafter "SB Dep.") at 7:19-22; 19:8.)  Plaintiffs fostered A.B. when she was an infant and ultimately adopted her. (Pls.' Ex. C, Deposition of Danelle Bostrom, taken on December 1, 2010 (hereinafter "DB Dep.") at 14:14-20; 19:14-19.)  A.B. was born crack cocaine and heroin addicted and started to exhibit signs of psychological and social problems at an early age.  (Id. at 23:10-24.)

When A.B. was thirteen, she started to run away from home and eventually the Plaintiffs admitted her to the Crisis Center in Bridgeton Hospital where she was diagnosed with borderline

personality disorder. (Id. at 24:13-27:24.)  When A.B. would run away, it was believed she would engage in sexual activity.  In addition, A.B. began hearing voices and making violent threats against Danelle Bostrom while at home.  Consequently, Plaintiffs contacted DYFS for assistance.  (Id. at 28:14-23.)  Plaintiffs signed a residential placement agreement with DYFS which allowed DYFS to take temporary custody of A.B. and place her in a mental health facility.  (Id. at 29:16-16.)  The last date when A.B. resided with the Bostroms was August 29, 2004; she was placed in a DYFS facility on August 30, 2004 and had been in DYFS custody since June 22, 2005. (Pl.'s Ex. K, Verified Complaint, at ¶ 6b, and Order to Show Cause and To Appoint a Law Guardian with Temporary Custody.)  Thus, A.B. had not resided in the Bostrom household for more than 27 months before the night in question on December 13, 2006.

When A.B. was placed in the mental health facility, she underwent a physical and it was discovered that she was two months pregnant.  (Id. at 30:14-16.)  A.B. was then moved to a different facility, Capable Adolescent Mothers ("CAM"), in Burlington.  (Id. at 31:14-17.)

A.B. gave birth to her daughter in the CAM facility and shortly thereafter ran away with the baby.  (Id. at 32:12-14.) A.B. returned to the facility at which point DYFS took custody of the baby and A.B. was placed in a therapeutic foster home.  (Id.

at 33:8-16.)  A permanency order was issued by the Superior Court
of New Jersey on August 4, 2005 wherein the court concluded, "It
is not and will not be safe to return the child (A.B.) home in
the foreseeable future because: A.B. needs the services of a
therapeutic foster home."  (Pls.' Ex. L.)

On February 11, 2006, A.B. ran away from her foster home and
was reported missing.  (Pls.' Ex. F., Deposition of Noberto
Torres, taken on February 29, 2012 (hereinafter "Torres Dep.") at
33:6-8.)  DYFS itself reported A.B. missing to the Human Services
Police on June 28, 2006.  (Id. at 34:10-16.) Defendant Torres was
assigned to the case and began investigating A.B.'s whereabouts
on November 8, 2006.  (Id. at 33:16-21.)

Also during 2006, several hearings were held regarding
A.B.'s custody and court orders were entered which stated that
A.B. and her daughter were to remain in the care and custody of
DYFS.  (Pls.' Ex. J, Deposition of Tara Broglin, taken on
September 27, 2012 (hereinafter "Broglin Dep.") at 82:24-87:20.)
The most recent order prior the December incident was issued by
the Superior Court on May 2, 2006, and reaffirmed that A.B. was
to continue in the custody and care of DYFS.  (Id. at 86:12-19.)

In November, 2006, Defendant Torres began his investigation
to locate A.B. and developed a "really good relationship" with
Plaintiffs.  (Torres Dep. at 37:6-7.)  Torres met with the
Plaintiffs and the Plaintiffs informed Torres of A.B.'s

behavioral problems, their inability to control her, A.B.'s
placement in DYFS programs to attempt to correct these problems
and A.B.'s tendency to run away.  Presumably during his
investigation, Torres had the opportunity to look at A.B.'s
troubled history and series of placements over the many months of
DYFS custody including the court orders that established that
A.B. was not in the Bostroms' custody.  Plaintiff Danelle Bostrom
explained to Torres that she believed A.B. was being held against
her will for prostitution.  (Id. at 35:8-37:3.)

    In December 2006, Defendant Torres received leads regarding
A.B.'s whereabouts and eventually located A.B. on December 13,
2006, in a house living with an adult male.  (Id. at 42:13-46:9.)
Defendant Torres, working with his partner, Defendant McCloy,
took A.B. into custody and transported her to the Bridgeton DYFS
office at approximately 8:00 PM.  (Id. at 46:23-47:9; 49:2-50:14;
60:11-14.)  Because A.B. was located after-hours, Torres and
McCloy contacted the DYFS hotline to send caseworkers to the
Bridgeton office so A.B. could be placed in a home.  (Id. at
49:2-11.)  At the time Torres and McCloy found A.B., Torres was
under the impression that DYFS had custody of A.B. and did not
have reason to believe Plaintiffs had custody over A.B.  (Id. at
47:18-48:14.)

    Defendant Schuh and Defendant Broglin arrived at the
Bridgeton office as the after-hours caseworkers called in to

handle A.B.'s placement at approximately 8:30 PM.  (Id. at 50:2-6; 60:15-18.)  Defendant Broglin had no prior contact with A.B. and had not handled A.B.'s case previously.  (Pls.' Ex. J, Deposition of Tara Broglin, taken on September 27, 2012 ("Broglin Dep.") at 12:15-22.)  Defendant Schuh, on the other hand, was A.B.'s caseworker from 2004-2005 and at the time of the December 13, 2006 incident was the supervisor on A.B.'s case. (Pls. Ex. H, Deposition of Denise Schuh-Martinelli, taken on January 23, 2012 and January 27, 2012 ("Schuh Dep.") at 26:5-27:7; 36:16-37:19; 41:17-42:5.)  As part of Schuh's duties as a supervisor, Schuh met regularly with A.B.'s caseworker, Shakeiya Cuff, and was familiar with A.B.'s file.  (Id.)  Schuh likewise thus had reason to know that A.B. had not resided with the Bostroms since August of 2004 and that A.B. was in DYFS custody.  At the time Schuh responded to the after-hours call, Schuh was working in her capacity as a caseworker with the Special Response Unit, not as the supervisor on A.B.'s case.  (Id. at 54:1-6.)

When Broglin arrived at the Bridgeton office, she spoke with A.B. to discuss the relationship with her family and explain that A.B. would need to get a complete physical prior to being placed. (Broglin Dep. at 20:21-21:12.)  Broglin also spoke with Officers McCloy and Torres.  (Id. at 22:8-23:16.)  Broglin spoke with Schuh who informed her that Plaintiffs had custody of A.B., not DYFS.  (Id. at 25:11-23.)

Schuh allegedly came to the conclusion that A.B. was in Plaintiffs' custody by checking the DYFS computer system which indicated that Plaintiffs, not DYFS, had custody.  (Schuh Dep. at 86:25-87:13.)  The DYFS computer system did not have digital copies of court orders or paperwork from the file.  Rather, the DYFS computer system was a database and information was put in the system by the DYFS clerical department, not caseworkers or supervisors.  (Schuh Dep. at 105:8-107:9; Broglin Dep. at 88:7-90:14.)  Information was sometimes entered incorrectly on the DYFS computer system and it was known by Broglin and Schuh that information contained in the database could be inaccurate. (Schuh Dep. at 105:22-23; Broglin Dep. at 88:15-22.)  Apparently, the computer database was so incorrect and out of date that it reflected none of the activity over the many months of DYFS' own custody of A.B.  Schuh did not check the physical file on A.B. to determine custody.  Schuh testified that this was because the physical file was located in Trenton for an adoption summary to be written about A.B.'s child.  (Id. at 210:22-25.)  Broglin did not independently check the computer system or physical file to verify that Plaintiffs had custody of A.B.  (Broglin Dep. at 25:15-23; 27:3-15.)  There is a dispute whether A.B.'s physical file was located in the office on the night of the incident. Shakeiya Cuff, A.B.'s caseworker, testified that A.B.'s file was in her desk in the Bridgeton office and accessible on the night

of the incident.  (Pls.' Ex. I, Deposition of Shakeiya Cuff,
taken on February 23, 2012 ("Cuff Dep.") at 131:6-15.)

Broglin then called Plaintiffs to inform them that A.B. had
been found and she would be returned to their home once a
physical was complete.  (Id. at 33:8-23.)  Stephen Bostrom
answered the phone and spoke with Broglin.  Broglin informed Mr.
Bostrom that A.B. was found and they were going to take her to
the hospital to get checked and then return her to Plaintiffs'
home.  (SB Dep. at 13:3-8.)  Mr. Bostrom told Broglin, "You
cannot bring her to our home" and informed her that there was a
court order in place telling DYFS not to return her to the family
home.  (Id. at 13:10-12.)  Broglin insisted that there was no
problem bringing A.B. to Plaintiffs' home, that there didn't
appear to be anything wrong with A.B. and she did not understand
why Plaintiffs would not accept A.B. back into the home.  (Id. at
13:24-14:4.)  Mr. Bostrom informed Broglin that she should review
A.B.'s file, that A.B. needed to be taken to Crisis and that a
court order was in place preventing her from residing at
Plaintiffs' home.  (Id. at 14:13-20.)  Mr. Bostrom testified that
Broglin then told Mr. Bostrom that he was an unfit parent and was
derogatory toward him, using profanity.  (Id. at 14:23-15:1.)

Danelle Bostrom overheard Broglin yelling profanities at her
husband and noticed Stephen getting irate.  Danelle then took the
phone from Stephen and proceeded to speak with Broglin in an

effort to calm the situation down. (DB Dep. at 40:4-10.) Broglin continued to berate Danelle saying things like, "What kind of F'n parent aren't [sic] you" when Danelle tried to explain why A.B. could not return home. (Id. at 41:8-11.) Danelle explained to Broglin that a court order was in place stating that it was unsafe for A.B. to reside at their home. Broglin then told Danelle not to tell her how to do her "F'n job." (Id. at 42:6-10.) Danelle then asked to speak to Broglin's supervisor. (Id. at 41:12-13.)

Denise Schuh then got on the phone with Mrs. Bostrom. Mrs. Bostrom was initially relieved because Schuh worked on A.B.'s case for over two years. (Id. at 41:14-16.) Danelle asked Schuh, "What is going on, why can't they . . . " and was cut off by Schuh. (Id. at 41:17-18.) Schuh said, "Mrs. Bostrom, if you don't let us drop your daughter off after we place her, it will be after midnight, we will be coming to your home to make sure your boys are still breathing." (Id. at 41:19-22.) Danelle Bostrom told Schuh to look in A.B.'s file and that A.B. could not return home. Schuh responded by saying, "You heard what I said." (Id. at 41:23-42:2.)

Defendants Schuh and Broglin do not deny having these conversations with the Plaintiffs, although they deny using profanity. Schuh and Broglin also deny that the Plaintiffs informed them about a court order prohibiting A.B. from residing

at the family home.  However, Broglin admits that the Plaintiffs expressed concern for the safety of their two other minor children, JB1 and JB2, if A.B. stayed in their home.  (Broglin Dep. at 35:3-36:7.)  Schuh only admits to speaking with Danelle Bostrom for approximately five minutes after Broglin informed her Plaintiffs refused to take custody of A.B.  (Schuh Dep. at 80:7-10; 88:19-25.)  It is undisputed by the parties that court orders were in effect which prohibited A.B. from returning to the family home and the computer system erroneously indicated the Plaintiffs had custody of A.B.

Plaintiffs then prepared for DYFS caseworkers to come to their home.  First they called the township police and the state police for assistance.  Both police departments informed them that they would have to let DYFS into their home and that if they refused, they would assist DYFS and make them open their door. (DB Dep. at 43:2-9.)  Plaintiffs felt defenseless and decided to stay up and wait for DYFS to come to their home.  (Id. at 43:19-44:21.)

In the meantime, Defendants Schuh and Broglin prepared to place A.B. in a foster home and remove A.B. from Plaintiffs' custody.  Broglin, after speaking with the Plaintiffs, did not make any attempt to verify that Plaintiffs, not DYFS, had custody of A.B.  Instead, Broglin relied on Schuh's previous representation that Plaintiffs had custody.  Schuh likewise did

not check A.B.'s actual records to verify whether DYFS or Plaintiffs had custody of A.B. after Plaintiffs refused to allow A.B. into their home.  Schuh relied solely on her previous check of the flawed computer system.  Apparently, Schuh's personal knowledge of A.B.'s tumultuous history and DYFS custody also failed her.  In addition, Schuh did not speak further with the Plaintiffs to verify that they had custody.  (Schuh Dep. at 87:10-13.)

During this time, A.B. waited in the DYFS office with Officers Torres and McCloy.  Officer Torres testified that A.B. was not upset about being in DYFS custody and he never observed her yelling at her parents over the phone.  (Torres Dep. at 64:21-24; 66:25-67:10.)  Schuh disputes this and testified that at times she observed A.B. visibly upset when talking to her father over the phone.  (Schuh Dep. at 241:9-242:23.)  Neither Stephen or Danelle Bostrom testified to having any conversation with A.B. over the phone on the night of the incident.

Schuh secured a placement for A.B. in a foster home and prepared to serve Plaintiffs with emergency removal papers, commonly referred to as a Dodd removal order, which would transfer custody of A.B. from Plaintiffs to DYFS.  (Schuh Dep. at 141:2-6; 211:20-212:11; 218:9-219:6.)  Schuh contacted her on-call supervisor, Joanne Fadool, to inform her of the situation and discuss whether it was necessary to go out to Plaintiffs'

home to serve them with the Dodd papers. (Id. at 219:3-10.)
Schuh testified that she told Fadool the Plaintiffs had custody
of A.B. and needed to be served with court paperwork. Schuh also
informed Fadool that Plaintiffs "did not want us to come to the
home and they were very belligerent with us" and asked Fadool for
guidance on how to proceed. (Id. at 67:7-15.) Schuh's written
report of the incident also reflects that she "called Supervisor
J. Fadool to inform of the uncooperative and belligerent
parents." (Schuh Dep. at 278:15-18.) After speaking with Schuh,
Fadool authorized the Defendants to search Plaintiffs' home.

Schuh admitted that there was no basis to conclude that the
other two minor children, JB1 and JB2, residing at the Bostrom
home, were in danger. (Id. at 219:18-20.) Broglin also admitted
that she had no specific information that JB1 or JB2 were in any
danger at the Plaintiffs' home. (Broglin Dep. at 46:9-17.)

Schuh testified that Fadool[2] instructed her to go out to
Plaintiffs' home, serve the Dodd paperwork and conduct a search
of Plaintiffs' home and assess the safety of the other two minor
children. (Schuh Dep. at 219:3-220:1.) This search was to be
conducted because it was the policy of DYFS to search the home
and interview the remaining minor children when a Dodd removal
was issued. This policy and procedure was not written down or

---

[2] Fadool's testimony, either in deposition form or
affidavit, is not part of the record. The only evidence of
Fadool's instructions to Schuh is Schuh's deposition testimony.

produced in discovery but was testified to by Schuh and Broglin. (Schuh Dep. at 219:23-220:6; Broglin Dep. 29:6-21; 47:4-18.)

A.B. was then taken to the hospital and medically cleared. Then A.B. was successfully placed in a foster home in Salem. (Broglin Dep. at 51:2-9.) Schuh and Broglin then asked Officers Torres and McCloy to accompany them when they served the removal papers. Specifically, Schuh and Broglin told Torres and McCloy that Stephen Bostrom was hostile to them over the phone and they had a concern for their safety. (Torres Dep. at 68:3-69:1.) As Human Services Police Officers, part of Torres and McCloy's job responsibilities included accompanying caseworkers on investigations when the caseworker felt concerned for their safety. (Id. at 20:4-24.)

At 1:04 A.M. on the morning of December 14, 2013, Defendants Schuh, Broglin, Torres and McCloy arrived at Plaintiffs' home and proceeded to serve Plaintiffs with the Dodd removal forms, search their home and assess the safety of JB1 and JB2. (Torres Dep. at 67:24-68:2.) When the Defendants arrived, Stephen Bostrom met them at the doorway to the house. Danelle Bostrom, JB1 and JB2 were asleep. (SB Dep. at 17:24-18:7.)

Stephen Bostrom saw headlights come down his driveway and met the four Defendants outside his door. (SB Dep. at 23:19-24:11.) No introductions were made but Mr. Bostrom recognized Officer Torres from previous meetings and knew Denise Schuh.

16

(Id. at 24:18-26:3.) Schuh then told Mr. Bostrom, "We are issuing an emergency removal of your child without a judge's consent." (Id. at 25:22-24.) Schuh explained that an emergency removal did not require a warrant. (Id. at 30:3-13.) Mr. Bostrom responded, "Do you really have to do this?" (Id. at 26:2-3.) Schuh replied, "I am doing this" and asked Mr. Bostrom to open the door. (Id. at 26:5-11.) Mr. Bostrom replied, "It doesn't appear that I have a choice" and opened the door. (Id. at 26:13-14.) Stephen Bostrom testified that "I felt that I had no choice but to open the door to my house because I did not know my exact rights." (Id. at 26:7-9.)

Officer Torres and Broglin entered the house. There is conflicting testimony whether Officer McCloy and Schuh entered the house or remained outside. Broglin and Schuh testified that McCloy and Schuh were not allowed in by Mr. Bostrom and remained outside. Torres, McCloy and Mr. Bostrom testified that all four defendants entered the home.

Once inside the house, Mr. Bostrom was informed that the Defendants would be checking the house and checking JB1 and JB2. Mr. Bostrom requested that Officer Torres and Broglin be the individuals to conduct the search and asked Schuh and McCloy to remain in the foyer. (SB Dep. at 26:18-27:22.) Mr. Bostrom explained that he felt he could trust Officer Torres and that he did not trust Broglin or Schuh walking around his home and near

17

his children.  (<u>Id.</u>)

Broglin and Torres then began their inspection of the house. Broglin checked for heat, opened the refrigerator and cabinets to verify there was food, and turned on the faucet to verify that the Plaintiffs had running water.  (<u>Id.</u> at 31:3-13.)  Broglin then asked where JB1 and JB2 were and proceeded down the hallway. First, Broglin went to JB1's room where JB1 appeared to be sleeping.  Broglin saw JB1 breathing and could see his legs which did not have any exposed marks.  Officer Torres and Mr. Bostrom were present when Broglin did her visual examination of JB1 from the doorway of JB1's bedroom.  (<u>Id.</u> at 31:17-32:20.)

JB1 testified in his deposition that he was partially awake and heard low voices outside his room.  JB1 stated that he kept his eyes closed but saw lights sweep the room.  JB1 was aware of people outside his door and feeling tension.  (Pls.' Ex. D, Deposition of JB1, taken on April 23, 2012, ("JB1 Dep.") at 29:9-32:20.)

Broglin then proceeded to JB2's room with Mr. Bostrom and Officer Torres.  JB2 was covered up in his blankets asleep. Broglin then proceeding to walk into his room and lean over JB2 to verify that he was breathing.  Broglin was approximately 12-18 inches away from JB2 but did not touch him.  (SB Dep. at 32:22-34:7.)  JB2 did not wake up during this encounter.  Broglin then stated, "The children appear to be fine, the home appears to be

fine." (<u>Id.</u> at 34:19-21.)

Stephen Bostrom then escorted Broglin and Torres back to the foyer. Schuh then informed Mr. Bostrom that there was a court date on the emergency removal notice. (<u>Id.</u> at 35:24-36:2.) Officer McCloy then told Mr. Bostrom that he should not treat his child like a stray dog and kick it to the curb. (<u>Id.</u>) Mr. Bostrom then asked the Defendants if they were finished. The Defendants said they were. Mr. Bostrom then told the Defendants to get out of his home. (<u>Id.</u> at 36:3-10.)

The Defendants then left the house. As Schuh was leaving, Mr. Bostrom told her that she had made a very big mistake and that the Plaintiffs had not done anything wrong. Schuh advised Mr. Bostrom not to threaten her. The Defendants then left. (<u>Id.</u> at 36:11-21.)

Later that day on December 14th, Plaintiffs contacted an attorney and sought legal advice with regards to the emergency removal. That afternoon, Shakeiya Cuff telephoned the Plaintiffs and informed then that they did not need to appear in court the next day. (<u>Id.</u> at 39:9-40:17.) Mr. Bostrom asked Cuff why they did not have to appear and she said she did not know but could find out. Cuff put Mr. Bostrom on hold and came back on the phone. Cuff informed Mr. Bostrom that it was apparent DYFS had custody of A.B. the entire time and the emergency removal was not necessary. (<u>Id.</u> at 40:17-41:1.)

## B. Procedural History

The instant action was filed in New Jersey Superior Court, Cumberland County on December 12, 2008, alleging violations of 42 U.S.C § 1983.  The Plaintiffs named as defendants New Jersey Division of Youth and Family Services (DYFS), New Jersey Department of Human Services (NJHS), Denise Schuh, Tara (LNU), Officer (FNU) Torres, Officer (FNU) McCloy, Thomas Burns and fictitious defendants John Does.  Defendants Schuh, McCloy, and Burns filed answers to the complaint.

On July 31, 2009, the state court issued an order dismissing all claims for money damages against DYFS and NJHS.  The only remaining claims against these two defendants were for injunctive relief.  [Docket Item 1-8.]  Discovery was then conducted.  On January 6, 2011, the state court issued a case management order which noted that the party previously identified as Tara (LNU) was identified as Tara Broglin.  The state court permitted Plaintiff to file an amended complaint naming Tara Broglin as a defendant and permitting counsel for Defendants to waive and accept formal service of the amended complaint on behalf of Tara Broglin.  [Docket Item 1-11.]

The amended complaint was received and filed on February 22, 2011 naming Tara Broglin as a defendant.  [Docket Item 1-13.] Defendant Tara Broglin was then represented by Deputy Attorney General, along with all the other defendants in this case.

Defendant Broglin, in lieu of answering, filed a notice of removal and removed the case to federal court on the basis of federal question jurisdiction.  [Docket Item 1.]

After the case was removed, Defendants DYFS and NJHS moved to dismiss the complaint and this Court issued an opinion dismissing all claims against these state agencies.  [Docket Items 4 & 22.]

Discovery was concluded and the remaining defendants now move for summary judgment on all claims.

## III.  DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.  The Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999).  See also Scott v. Harris,

550 U.S. 372, 378 (2007) (The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.").

A defendant's entitlement to qualified immunity hinges on two considerations.[3]  First, a court must determine "whether the plaintiff has alleged a deprivation of a constitutional right at all," Pearson v. Callahan, 555 U.S. 223, 232 (2009)(citation omitted), which, as the Court of Appeals has emphasized, is not a question of immunity as such, "but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity." Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007).  A court must then decide "whether the right that was violated was clearly established, or, in other words, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (internal quotations and citations omitted).  This inquiry "must be undertaken in light of the specific context of the case, not as a

---

[3] While under Saucier v. Katz, 533 U.S. 194 (2001), overruled in part by Pearson, 555 U.S. at 234, the qualified immunity standard followed a "rigid order of battle," Pearson, 129 S.Ct. at 817 (citation omitted), in which the question of whether a right was clearly established was assessed only if the plaintiff had adequately alleged a violation in the first place, the Supreme Court adopted a more flexible approach in Pearson. As the Court explained, "[b]ecause the two-step Saucier procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking will best facilitate the fair and efficient disposition of each case." Pearson, 555 U.S. at 242.

broad general proposition." <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198 (2004) (citation omitted).

Defendants Schuh, Broglin, Torres and McCloy move for summary judgment dismissing all claims against them with prejudice. The Plaintiffs bring the following claims against the Defendants arising from the December 13 and 14, 2006, incident pursuant to 42 U.S.C. § 1983: Violation of the Right to Familial Integrity (Count I); Violation of Substantive and Procedural Due Process (Count II); Violation of the Fourth Amendment (Count III); Violation of the First Amendment (Count IV); Injunctive Relief (Count V). The Defendants argue that no genuine issues of material fact exist and the Plaintiffs have failed to establish their claims. Alternatively, the Defendants argue they are entitled to qualified immunity. Each claim will be addressed separately below.

## A. Fourth Amendment Claim (Count III)

The Defendants argue their motion for summary judgment on Plaintiffs' Fourth Amendment claim should be granted for several reasons. First, Defendants argue that they are not subject to the Fourth Amendment as the "home safety inspection" they conducted is not a search within the meaning of the Fourth Amendment. Defendants rely on <u>Wyman v. James</u>, 400 U.S. 309 (1971) in support of that argument. Next, Defendants argue that even if the Fourth Amendment applied, Plaintiff Stephen Bostrom

consented to the search.  Finally, Defendants argue that an
emergency situation existed because they reasonably believed the
other minor children in the home were in danger.  Defendants
maintain that while they were mistaken about who had custody of
A.B., this mistake was at most negligent and cannot be the basis
for liability under Section 1983.

### 1.  Does the Fourth Amendment apply?

In Wyman, the Supreme Court held that home visitations by
case workers from the New York Department of Social Services were
not "searches" within the meaning of the Fourth Amendment.  400
U.S. 309, 317 (1971).  The plaintiff in Wyman was a recipient of
Aid to Families with Dependent Children who refused to let her
caseworker visit her home.  The purpose of the caseworker's visit
was to gather information from the plaintiff relevant to her need
for public assistance.  As a result of the plaintiff's refusal to
allow a home visit, her benefits under the program were
terminated.  Wyman, 400 U.S. at 313-14.

The Supreme Court found that the caseworker's home visit was
not a search within the meaning of the Fourth Amendment.  The
Supreme Court reasoned that the caseworker's purpose in the home
is more rehabilitative, not investigative.  If a person denies
entry to the home, no visit will take place and the financial aid
will simply be terminated.  Consequently, the Supreme Court
concluded that "the visitation in itself is not forced or

compelled" and if a recipient denies a home visit, "there is no entry of the home and there is no search." Id. at 318. Therefore, the Supreme Court found that the caseworker's home visit was not a search within the meaning of the Fourth Amendment.

Alternatively, the Supreme Court also concluded that if the Fourth Amendment applied, the search conducted in Wyman was reasonable.  The court listed several factors, including: the public's interest in protecting dependent children; the distribution of federal and state funds in public trust; the rehabilitative focus of the welfare program; written notice was provided to beneficiaries several days in advance of the home visit; no forcible entry is permitted; visitation outside working hours or "snooping in the home" were forbidden; visit was not made by police or uniformed authority; the home visit was not a criminal investigation; and the warrant procedure would be more intrusive than the procedure in place by the department of social services.  Id. at 318-23.

After reviewing the Wyman decision and subsequent case law, the Defendants' argument is unpersuasive and the Court concludes that the inspection of the Bostrom home conducted by Defendants is a search within the meaning of the Fourth Amendment.

Since the Wyman decision was issued, it has not been applied in the context of a home inspection by social service workers

investigating allegations of child abuse in this Circuit.  The
Third Circuit, in <u>Good v. Dauphin County Social Services for
Children and Youth</u>, 891 F.2d 1087 (3d Cir. 1989), held that a
home inspection conducted by a case worker and police officer
investigating child abuse allegations was a search within the
meaning of the Fourth Amendment.  The District of New Jersey
likewise found that the Fourth Amendment applied in analyzing
whether a caseworker's entry into a home was reasonable when
investigating allegations of child abuse.  <u>Coleman v. State of
New Jersey Division of Youth and Family Services</u>, 246 F. Supp. 2d
384, 391 (2003)(J. Irenas).  Consequently, <u>Wyman</u> has not been
extended to apply to a caseworker's home investigation pertaining
to suspected child abuse.  These investigations have been
recognized in the Third Circuit as government searches and
subject to the restrictions of the Fourth Amendment.

Furthermore, the facts of this case are distinguishable from
<u>Wyman</u>.  Here, the Defendants' purpose in visiting the home was
purely investigative.  The proffered justification for the entry
was to protect children who may be in danger from their parents.
The search of the home was not in any way related the receipt of
public funds or public assistance.  The social workers were
accompanied here by two police officers employed by DYFS.
Finally, if Plaintiffs refused entry into the home, the
investigation still would have taken place.  Whether Defendants

would have forced entry into the home, contacted the state police for assistance or sought an ex parte order from the court, the investigation would have occurred.  Unlike the home visit in Wyman which would not have occurred if beneficiaries refused entry, here, Plaintiffs' refusal did not mean that no search would take place.  Accordingly, Wyman is distinguishable from this case and Defendants' investigation of Plaintiffs' home was a search within the meaning of the Fourth Amendment.

Finally, Defendants' search in this case, unlike Wyman, was not reasonable per se.  While there is a strong public interest in protecting the welfare of dependent children, this does not give social workers carte blanche to conduct an invasive home search that does not comply with the Fourth Amendment.  Here, as distinct from Wyman, the Plaintiffs were not receiving public funds; there was no advance written notice of the search; the investigation was conducted at 1:00 AM (well outside normal business hours); the Plaintiffs' home and children were inspected; and the caseworkers were accompanied by armed, uniformed Human Services Police Officers.

Therefore, the Fourth Amendment applies and the Defendants' reliance on Wyman is unpersuasive in the present circumstances.

### 2.   Did Plaintiff Stephen Bostrom consent to the search?

It is well established that a search conducted without a warrant issued upon probable cause is per se unreasonable under

the Fourth Amendment unless an exception to the warrant requirement applies. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). One exception to the warrant requirement is that the search is conducted with consent. Id. Consent must be given voluntarily and must not be the result of coercion, express or implied. Id. at 248. The Supreme Court has explained:

> if under all the circumstances it has appeared that the consent was not given voluntarily -- that it was coerced by threats or force, or granted only in submission to a claim of lawful authority -- then we have found the consent invalid and the search unreasonable.

Id. at 233. "Voluntariness is a question of fact to be determined from all the circumstances." Id. at 248-49.

In this case, genuine issues of a material fact exist as to whether Plaintiff Stephen Bostrom consented to the search of his home. Defendants testify in their deposition that Mr. Bostrom invited them inside and welcomed them into his home. Mr. Bostrom's testimony tells a different story. Mr. Bostrom testified that he met the Defendants outside his home and asked if the search was necessary. Defendant Schuh allegedly responded that the search would happen and it was necessary. Two uniformed and armed Human Services Police Officers, McCloy and Torres, were present with the DYFS case workers which gave them a visible claim of authority. Mr. Bostrom testified that he told the Defendants that he understood he did not have a choice and was required to let them in. Mr. Bostrom was never informed that he

could refuse the Defendants' request to enter his home.

Viewing these facts in the light most favorable to the Plaintiffs, a rational jury could conclude that Mr. Bostrom only allowed Defendants into his home because he was submitting to a claim of lawful authority. While the Defendants were not obligated to inform Mr. Bostrom of his rights to refuse the search, Mr. Bostrom's ignorance of his rights is a factor that can be considered by the jury in determining whether the consent was voluntary. Schneckloth, 412 U.S. at 249 ("the subject's knowledge of a right to refuse is a factor to be taken into account" when determining the voluntariness of consent). Here, the Plaintiffs called the municipal police and the state police inquiring about their ability to prevent DYFS from searching their home. Both police departments told the Plaintiffs they could not refuse the search. Although these statements would be hearsay if offered for the truth of their contents, here the statements are offered as information learned by Mr. Bostrom that informed his decision to not refuse entry. When caseworkers arrived at 1:00 AM with two uniformed, armed officers, Stephen Bostrom again inquired whether the search was necessary. He was told by Defendant Schuh that the search would be done. Stephen Bostrom then commented that he did not have a choice and could not refuse the search. It was only after this dialogue that Defendants were allowed into the home. A rational factfinder

could conclude, based on these facts, if believed, that Stephen Bostrom's consent was not voluntary.

Therefore, there is a material factual dispute as to the giving of voluntary consent, which cannot be resolved in a motion for summary judgment.

### 3. Did exigent circumstances exist?

The Supreme Court has explained, "warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 393-94 (1978). For example, as the Supreme Court reiterated in Brigham City, Utah v. Stuart, 547 U.S. 398, 403, (2006), "law enforcement may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id., citing Mincey, 437 U.S. at 392.

In this case, a reasonable jury could find that exigent circumstances did not exist to justify the search of Plaintiffs' home without a warrant. Defendants argue that Plaintiffs refused custody of A.B. and this created an allegation of child abuse/neglect which triggered a DYFS policy requiring an investigation of JB1 and JB2. Defendants further rely on

N.J.S.A. 9:6-8.29[4] which permits an emergency removal of a child without a court order.

However, both Defendant Broglin and Defendant Schuh testified that they had no reason to believe JB1 and JB2 were in any imminent danger. No allegations of abuse were made with regard to these children. Instead, the record contains no indication that A.B. herself was ever abused in the Bostrom home. Defendants Schuh and Broglin also testified that A.B. was not in any danger from Plaintiffs as A.B. was not residing with the Plaintiffs at the time of her removal from their custody. A.B. was successfully placed in a foster home prior to the search of Plaintiffs' residence and she had not been residing with the

---

[4] N.J.S.A. 9:6-8.29(a) provides:

A police officer or a designated employee of the Probation Division or a designated employee of the division may remove a child from the place where the child is residing, or any person or any physician treating a child may keep a child in the person's or physician's custody without an order pursuant to section 8 of P.L.1974, c.119 (C.9:6-8.28) and without the consent of the parent or guardian regardless of whether the parent or guardian is absent, if the child is in such condition that the child's continuance in the place or residence or in the care and custody of the parent or guardian presents an imminent danger to the child's life, safety, or health, and there is insufficient time to apply for a court order pursuant to section 8 of P.L.1974, c.119 (C.9:6-8.28), or any physician or hospital treating a child may keep a child in custody pursuant to P.L.1973, c.147 (C.9:6-8.16 et seq.). The Division of Child Protection and Permanency shall not be required to provide reasonable efforts to prevent placement if removal of the child is necessary due to imminent danger to the child's life, safety, or health in accordance with section 24 of P.L.1999, c.53 (C.30:4C-11.2).

Plaintiffs when she ran away. Indeed, A.B. had not resided in the Bostrom residence in 27 months, so there was certainly no exigency in gaining access to the residence to assure the safety of JB1 and JB2 merely due to the happenstance that A.B. had finally been discovered living elsewhere.

Defendants Schuh and Broglin both testified that they conducted the search of Plaintiffs' home and JB1 and JB2 because DYFS policy required them to do a search of a home when serving Dodd removal papers. Defendant Schuh testified that her supervisor ordered her to do the search because it was DYFS policy and could not be waived. It was this policy, and this policy alone, that was the impetus for searching Plaintiffs' house.[5] An unwritten internal affairs policy of a state agency cannot trump the mandates of the Fourth Amendment. While it may be necessary to conduct an emergency warrantless home search when a caseworker has reason to believe the other minor children in the home are in danger, there is no evidence that the safety of JB1 or JB2 were threatened in this case.

Defendants McCloy and Torres accompanied Schuh and Broglin on the search solely because Schuh and Broglin felt Mr. Bostrom was belligerent on the phone and wanted the officers present for their own safety. The Third Circuit addressed a similar

---

[5] This policy has not been produced in discovery and there is no evidence absent Schuh and Broglin's testimony that this policy actually existed in 2006.

situation in _Good_, where a police officer accompanied a caseworker on a home search solely because the caseworker feared for her safety. The Third Circuit held the police officer to the same standard as the caseworker when analyzing the Fourth Amendment. _Good_, 891 F.2d at 1091-1096. The Third Circuit squarely held that "the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." _Id._ at 1094. However, it should be noted that the police officer in _Good_ actively participated in the search and actually conducted a strip search of the child who was reportedly abused. _Id._

In this case, Defendant Torres accompanied Broglin on the search and Defendant McCloy remained in the foyer. No strip search was conducted of the children. JB1 and JB2 remained in their beds and were subject only to a visual inspection by Broglin. The only reason Torres and McCloy entered Plaintiffs' home and participated in the search was because Broglin and Schuh feared for their safety and requested their assistance. Torres and McCloy had no independent knowledge of circumstances giving rise to the 1:00 AM search and had no reason to believe anyone in Plaintiffs' residence was in danger of imminent harm. Torres, of course, may have known from his weeks-long investigation before December 14, 2006, that A.B. had not even resided at the Bostrom

residence for several years.  Consequently, there is a genuine issue of material fact as to whether McCloy and Torres violated the Plaintiffs' Fourth Amendment rights.

### 4.  Qualified Immunity

As discussed above, there is a genuine issue of material fact as to whether Plaintiffs' Fourth Amendment rights have been violated.  The primary issue before the court is whether the violation that occurred here was one a reasonable officer in the Defendants' circumstances could have committed.

Liability of an individual who acts under color of state law is not automatic upon the violation of a constitutional right. The law recognizes that an officer who acts in a good faith belief, objectively viewed, that such conduct conformed to the constitution and federal laws will be immune from liability under § 1983.  The analysis of qualified immunity requires answering two questions:  First, whether "the officer's conduct violated a constitutional right," Saucier v. Katz, 533 U.S. 194, 201 (2001), and second, whether any such constitutional right was "clearly established," and in particular, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 201-02.  With regard to the warrantless search of a home, the Supreme Court found in 2004, two years before the events at issue here, that "[n]o reasonable officer would claim to be unaware of the basic rule, well established by

our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." Groh v. Ramirez, 540 U.S. 551,, 564 (2004). Within the broad scope of such a general proposition, however, a court must focus on whether the particular application of law under the circumstances confronting the officer were well established by precedent, Ashcroft v. Al-Kidd, 131 S. Ct. 2074, 2084-85 (2011)(courts should not "define clearly established law at a high level of generality"). The Third Circuit has explained that "[t]o determine whether a new scenario is sufficiently analogous to previously established law to warn an official that his/her conduct is unconstitutional, we 'inquir[e] into the general legal principles analogous factual situations . . . and . . . determin[e] whether the official should have related this established law to the instant situation.'" Burns v. PA Dep't of Corrections, 642 F.3d 163, 177 (3d Cir. 2011)(quoting Hicks v. Feeney, 770 F.2d 375, 380 (3d Cir. 1985). Further, the qualified immunity analysis can take into account whether the official's discretionary decision had to be a "split-second judgment," Saucier, 533 U.S. at 205 (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)), or whether the official had time to deliberate before acting, Reedy v. Evanson, 615 F.3d 197, 224 n. 37 (3d Cir. 2010)(considering that there were no split-second decisions made by the officials militated against immunity in summary judgment motion). The Court will

apply these principles to ascertain whether it would have been clear to a reasonable official that his or her conduct was unlawful in the situation he or she confronted, <u>Saucier</u>, 533 U.S. at 201-02.

The first issue is whether the Fourth Amendment right at issue was clearly established. While the right to be free from unreasonable searches of one's home was well established in 2006, the Court must analyze whether this right was clear in the particular circumstances of this case. <u>Anderson v. Creighton</u>, 483 U.S. 635, 639-40 (1987). "Some but not precise factual correspondence to precedent is necessary for the defendant to be charged with knowledge of the unlawfulness of his or her actions." <u>Stoneking v. Bradford Area School District</u>, 882 F.2d 720, 726 (3d Cir. 1989).

The Third Circuit has previously addressed a social worker's entrance into a home without a warrant or court order to investigate child abuse. In <u>Good v. Dauphin County Social Services for Children and Youth</u>, 891 F.2d 1087 (3d Cir. 1989), a social services agency received an anonymous tip that a child had bruises and was possibly being abused by her mother. <u>Id.</u> at 1089. The next day the child was not in school and a social services caseworker tried to contact the mother without success. <u>Id.</u> At approximately 10 P.M. that evening, a caseworker and a police officer arrived at the home and entered the residence to

investigate the allegations of child abuse.  Id. at 1089-90.
During the course of this search, the child was strip searched by
the caseworker despite the protests of the mother.  Id. at 1090.

The Third Circuit found that there were genuine issues of
material fact as to whether the mother consented to the search of
her home and held that exigent circumstances did not exist.  The
Third Circuit also concluded that the caseworker and the police
officer were not entitled to qualified immunity.  Id. at 1094-96.
In reaching this conclusion, the Third Circuit reasoned:

> The decided case law made it clear that the state may
> not, consistent with the prohibition of unreasonable
> searches and seizures found in the Fourth and Fourteenth
> amendments, conduct a search of a home or strip search
> of a person's body in the absence of consent, a valid
> search warrant, or exigent circumstances. Under that
> caselaw, not only the protected privacy interests but
> also the exculpatory concepts of "consent" and "exigent
> circumstances" in this context were well defined.

Id. at 1092.  The Third Circuit expressly rejected the
caseworker's argument that because the agency had received an
allegation of child abuse, and prevention of child abuse is a
prevailing state interest, that the caseworker was not bound by
the Fourth Amendment in conducting the search of the mother's
home and the strip search of the child.  In rejecting this
argument, the Third Circuit explained:

> As we have noted, Anderson teaches that a prior case on
> all fours is not necessary; a public official may not
> manufacture immunity by inventing exceptions to well
> settled doctrines for which the case law provides no
> support. It evidences no lack of concern for the victims
> of child abuse or lack of respect for the problems

associated with its prevention to observe that child
abuse is not sui generis in this context. The Fourth
Amendment caselaw has been developed in a myriad of
situations involving very serious threats to individuals
and society, and we find no suggestion there that the
governing principles should vary depending on the court's
assessment of the gravity of the societal risk involved.
We find no indication that the principles developed in
the emergency situation cases we have heretofore
discussed will be ill suited for addressing cases like
the one before us.

Id. at 1094. Consequently, the Third Circuit held that the

Fourth Amendment applied to a caseworker's search of a home and

search of a child's person and that absent consent or exigent

circumstances, a warrant or court order was required prior to

conducting such a search. Id. The Third Circuit also found that

this case law was well established in 1987 and did not grant the

caseworker or police officer qualified immunity.

The Good case remains good law and has not been overruled in

this Circuit. This case law was well established in 2006 when

the search at issue here took place. Though there are some

factual differences between this matter and the Good case, the

Good case corresponds substantially to the issues raised here and

should have been known by the Defendants. While JB1 and JB2 were

not strip searched, the search of Plaintiffs' home took place at

1 A.M. in contrast with Good's 10 P.M. time and the search was

not prompted by any allegations of child abuse. Good clearly

established that a warrantless search of a home cannot be

conducted by a social worker absent consent or exigent

circumstances.[6]  It would be clear to a reasonable officer in 2006 that the limitations of the Fourth Amendment applied to the search of the Bostrom home.

The remaining issue before the Court is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 201-02.

In this case, the Defendants argue that qualified immunity is appropriate because the decision to search Plaintiffs' home at 1:00 AM was made by Schuh and Broglin's on-call supervisor, Joanne Fadool, who is not a defendant in this case.  This decision was made pursuant to an unwritten DYFS policy that a home must be searched when Dodd removal papers are served when other minor children reside at the residence.  Consequently, Defendants assert that a reasonable caseworker in Schuh and Broglin's position would have searched Plaintiffs' home at 1:00 AM and would not have known such a search violated the Fourth Amendment.

This argument ignores several key facts.  First, A.B., at the time she was removed, was a run away who previously resided at a DYFS facility.  She did not run away from the Plaintiffs' residence and there was no evidence that the Plaintiffs' residence was unsafe.  The record contains no indication that

_____

[6] Further, the Court notes that the Defendants do not argue that any other exceptions to the warrant requirement apply to this case aside from consent and exigent circumstances.

A.B. was abused or neglected in the Bostrom residence.  A.B. was not being physically removed from Plaintiffs' residence at the time the Dodd papers were served, so the rationale behind the automatic search of the residence to protect the remaining minor children was absent.

Further, A.B. had a prior history with DYFS and court orders were issued regarding A.B.'s placement in foster facilities for over two years.  The information from these orders should have been present on the computer system.  Schuh was also the caseworker on A.B.'s case for more than a year and was the current supervisor on A.B.'s case at the time of the incident.

While Joanne Fadool ultimately gave the approval for Schuh and Broglin to search Plaintiffs' residence, this approval was given after a haphazard investigation by Broglin and Schuh into the custody of A.B., which failed to detect the numerous indications that DYFS had custody of A.B. for over two years because of A.B.'s inability to live in the Bostrom home as well as her threats to the younger children.  The central issue is not whether a reasonable officer would have searched Plaintiffs' home after getting approval by a supervisor.  The central issue is whether a reasonable caseworker would searched the Bostrom home and the children residing there in the way Broglin and Schuh did in the absence of exigent circumstances or consent.  That their incomplete investigation led to a complete misrepresentation of

A.B.'s custody status to the supervisor who authorized the search compounds this series of errors and omissions obscuring the fact that DYFS itself had custody of A.B. We are not assessing conduct of a state actor, for example, who is trying to get accurate information from another agency as to, for example, the existence of an arrest warrant where the similar name in a warrant database is confused with the name of the innocent arrestee. In such a situation, a reasonable officer may rely upon a law enforcement database in making an arrest that turns out to be a misidentification. See Arizona v. Evans, 514 U.S. 1 (1995)(holding that exclusionary rule did not apply to bar admission of evidence that was seized due to police officer's objective reasonable reliance on erroneous entry on computer system by court clerk) and Herring v. U.S., 555 U.S. 135, 146 (2009)("If the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests, exclusion would certainly be justified under our cases should such misconduct cause a Fourth Amendment violation.").

Viewing the facts in the light most favorable to the Plaintiffs, qualified immunity as to Schuh and Broglin should be denied. Schuh initially determined that Plaintiffs had custody of A.B. by doing a computer search. Schuh did not check the Plaintiffs' file and did not contact the Plaintiffs' caseworker,

41

Shakeiya Cuff, to determine custody, even after Mrs. Bostrom informed her that A.B. was in DYFS' own custody. While there is an issue of fact as to whether the file was in the Bridgeton Office at the time of the incident, the court must view the facts in favor of the Plaintiff for this analysis. Cuff testified that the file was indeed in her desk and therefore, the Court must assume the file was in the Bridgeton office readily available to Schuh at the time of the incident for purposes of this analysis.

Schuh then told Broglin that Plaintiffs had custody of A.B. Broglin then talked to the Plaintiffs who denied they had custody of A.B. and truthfully informed Broglin that DYFS had custody. Plaintiffs also correctly told Broglin that A.B. was a danger to their two other minor children and suffered from mental health issues. Broglin then transferred the call to Schuh and Plaintiffs reiterated to Schuh that they did not have custody of A.B. Apparently, Schuh's knowledge of A.B. being in DYFS custody for the past two years was not recalled. Schuh refused to listen to Plaintiffs and threatened Plaintiffs with a search of their home and their two minor children if they did not permit A.B. to return home.

Schuh and Broglin did not engage in any further viewing of DYFS records nor did they consult with A.B.'s caseworker to determine custody of A.B. after speaking with the Plaintiffs. Instead, they chose to rely solely on Schuh's previous search of

the computer system regarding A.B.'s custody, despite knowing that the database is often incomplete or out of date.

There is a strong argument that no reasonable officer in Schuh and Broglin's position would have relied solely on the computer inquiry to determine A.B.'s custody status, especially if that database was as outdated and incorrect as it appears to be here. In particular, Plaintiffs expressed to Schuh and Broglin that A.B. was a danger to the other minor children in their home and that a court order was issued preventing A.B. from returning to the residence. That was true and DYFS had the correct information available to Schuh and Broglin. No reasonable caseworker would have believed that entering and searching the Bostrom's residence without consent could be justified by exigent circumstances and thus permitted by the Fourth Amendment.

It is pivotal that there were no exigent circumstances that required Schuh and Broglin to rush to judgment about A.B.'s custody. A.B. was already placed in a foster home for the evening. There was no allegation that JB1 and JB2 were in danger. A reasonable caseworker would have contacted the caseworker on A.B.'s case to discuss the situation. A reasonable caseworker also would have searched for the physical file. A reasonable caseworker would have reviewed A.B.'s history in the DYFS records and seen that several court orders relating to

custody of A.B. were issued.  A reasonable caseworker would have looked into the previous placement of A.B. and realized that A.B. had not resided at Plaintiffs' home for over two years.  This would have led a reasonable caseworker to conclude, at minimum, that there was a genuine issue with regard to whether DYFS or Plaintiffs had custody of A.B. and that further information was necessary to determine whether a Dodd removal was even pertinent. Indeed, just a few hours into the next working day, DYFS acknowledged that no Dodd removal was pertinent, since the Bostroms were correct that they did not have custody of A.B.

In short, no reasonable case worker in Defendants' position would have believed that a search of this residence, absent consent or exigent circumstances to protect a child's safety, was permitted by the Fourth Amendment.

Instead, Schuh and Broglin threatened Plaintiffs with a search of their home and children *prior to speaking to any supervisor*.  Schuh and Broglin then failed to investigate any of Plaintiffs' claims regarding custody of A.B. or the safety of their other minor children if A.B. were allowed back into the home.

If the evidence proffered by Plaintiffs is accepted by the jury, this Fourth Amendment violation was beyond negligent as Schuh and Broglin made no attempt to investigate the veracity of Plaintiffs' allegation or determine whether there was any reason

to fear for the well-being of the minor children in Plaintiffs'
home. Schuh and Broglin's rushed actions were not the result of
exigent circumstances, or a reasonable belief that the minor
children were in danger, or a simple mistake in the computer
system but were the product of deliberate choices to conduct an
incomplete investigation to resolve the issue quickly rather than
correctly to conduct a warrantless search of the home. The Court
finds that no reasonable officer in the position of Schuh and
Broglin would have believed their actions in conducting a
warrantless search of the home were proper in the absence of
consent or particularized fears for the safety of the minor
children residing therein. Saucier, 533 U.S. at 201.

On the other hand, Torres and McCloy are entitled to
qualified immunity. As discussed above, they did no independent
investigation as to whether a search was necessary and relied
solely on Broglin and Schuh. Their mission was to assure the
safety of the social workers. This was the policy of human
services officers at the time of the incident and therefore a
reasonable officer in McCloy and Torres' position could have
committed the violation. Torres and McCloy reasonably believed
that Schuh and Broglin feared for their safety and this was a
sufficient reason for Torres and McCloy to accompany them on the
search. A reasonable officer in their position would have done
the same. Therefore, McCloy and Torres are entitled to qualified

immunity with regard to Plaintiffs' Fourth Amendment claims.

Accordingly, the Fourth Amendment claims against McCloy and Torres will be dismissed.  However, summary judgment will be denied as to Plaintiffs' Fourth Amendment claims against Schuh and Broglin.

**B. Fourteenth Amendment Claims (Counts I and II)**

Defendants argue summary judgment is appropriate to dismiss Plaintiffs' substantive and procedural due process claims. First, Defendants argue that these claims are duplicative of Plaintiffs' Fourth Amendment claims and should be dismissed. Second, Defendants argue that their conduct does not rise to the shocks the conscience standard required for substantive due process claims.  Further, Defendants maintain that JB1 and JB2 were not removed from Plaintiffs' custody so no right to familial integrity was violated.  Finally, Defendants argue that Plaintiffs were not deprived of any protected interest and were given adequate process so their procedural due process claim should be dismissed.

### 1.  Substantive Due Process Claim

The Supreme Court has held that all claims arising under § 1983 arising from an unreasonable search and seizure be dealt with exclusively under the Fourth Amendment rather than substantive due process.  <u>Graham v. Connor</u>, 490 U.S. at 395; <u>Albright v. Oliver</u>, 510 U.S. 266 (1994).  "Where a particular

Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing the claims." Albright, 510 U.S. at 273.

Here, Plaintiffs' substantive due process claim for violation of their right to familial integrity is based on the same facts which form their Fourth Amendment claim. The Plaintiffs' substantive due process claim for violation of the right to familial integrity arises solely from Defendants' search of their home. Consequently, Plaintiffs' substantive due process claim should be dismissed and the matter should be analyzed under the Fourth Amendment.

### 2. Procedural Due Process Claim

In order to establish a claim for deprivation of procedural due process rights under Section 1983, a plaintiff must show (1) that he was deprived an individual interest of liberty or property encompassed within the Fourteenth Amendment; and (2) the procedures used by the state to effect this deprivation were constitutionally inadequate. Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006).

Here, the Plaintiffs allege they were deprived of their liberty interest in being free from unreasonable searches, retaliation and interference with their right to family

integrity.  The violation of these rights all stem from the search conducted by Defendants which is squarely addressed by the Fourth Amendment.  The Plaintiffs were not deprived of custody of A.B., as DYFS already had custody.  JB1 and JB2 were not removed from the home.  The retaliation claim is addressed by the First Amendment, discussed in Section IV.C, below.  The unreasonable search is addressed by the Fourth Amendment in Section IV.A, above.  Consequently, the Plaintiffs have not alleged that they were deprived for a liberty or property interest which is not already addressed by Plaintiffs' First and Fourth Amendment claims.  If the court were to find that the Plaintiffs have established a deprivation of liberty on these facts, then all unreasonable searches would constitute procedural due process claims.  This would be impractical and duplicative.

The Plaintiffs' argument that their ongoing medical bills for psychological treatment as a result of the search constitutes a deprivation of property is unpersuasive.  Plaintiffs' medical bills are more akin to damages arising out of the Fourth Amendment violation, not a separate deprivation of property giving rise to a new constitutional procedural due process claim.

Therefore, the Court will grant summary judgment on Plaintiffs' procedural due process claims.  These claims are duplicative of Plaintiffs' Fourth Amendment claims and will be dismissed.

**C. First Amendment Claim (Count IV)**

Plaintiffs claim Defendants searched their home in retaliation for Plaintiffs telling Schuh and Broglin that A.B. could not be returned to their residence. Plaintiffs argue that Broglin and Schuh did not like being questioned on how to do their job and as a result, retaliated against them by conducting an intrusive home search.

Defendants argue that the Plaintiffs have failed to establish that they were subject to an adverse action by the Defendants or that Plaintiffs' speech was a substantial motivating factor for the search. Defendants argue that the home search conducted in this case would not have deterred a person of ordinary firmness from exercising their free speech rights. Defendants also argue that the Plaintiffs' speech was not a major purpose behind the home safety inspection. Defendants further argue that JB1 and JB2 do not have standing to bring these claims as they did not engage in any protected speech. Finally, Defendants assert they are entitled to qualified immunity because any such right was not clearly established by precedent.

### 1. Analysis

To state a First Amendment retaliation claim, a plaintiff must allege (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a

49

causal link between the constitutionally protected conduct and the retaliatory action.  Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).

As an initial matter, the Plaintiffs do not allege that they engaged in protected speech with McCloy and Torres.  On the record before the court, there is no basis for First Amendment claims against McCloy and Torres and summary judgment will be granted for McCloy and Torres as to these claims.

The Defendants do not dispute that Plaintiffs' comments to Defendants Schuh and Broglin regarding custody of A.B. were protected speech under the First Amendment.  The main issues are whether the second and third elements are met.

A rational factfinder could conclude that a search of a person's home at 1:00 AM is sufficient to deter a person of ordinary firmness from engaging in protected speech.  The late hour of this search is particularly intrusive, especially considering that three members of the household, two of whom were minor children, were asleep.  A factfinder could conclude that this type of invasive search would deter a person of ordinary firmness from speaking openly to DYFS caseworkers.

The third element is a closer question.  "If the defendant is able to show by a preponderance of evidence that the same decision would have been made had the protected conduct not played a substantial role, no relief will be required" under the

First Amendment.  Suppan v. Dadonna, 203 F.3d 228, 236 (3d Cir. 2000).  The Defendants argue that the decision to search the home was ultimately made by their supervisor, Joanne Fadool, who had no knowledge of the conversation between Broglin and the Plaintiffs.  In addition, Defendants argue that search was conducted pursuant to DYFS policy and would have happened regardless of Plaintiffs' speech.

There is evidence that Schuh and Broglin threatened to search Plaintiffs' home while they were on the phone with the Plaintiffs and before speaking to their supervisor, Fadool.  It is unclear what was said to Fadool or why Fadool permitted the search to occur as Fadool's testimony is not in the record. Without Fadool's testimony, the Court cannot conclude as a matter of law that the search would have occurred regardless of Plaintiffs' comments to Schuh and Broglin regarding custody of A.B.  Further, without Fadool's testimony, the court cannot conclude that Fadool had no knowledge of the conversation between Broglin and the Plaintiffs.

As far as DYFS policy, this policy was not produced in discovery and is evidenced only by Schuh and Broglin's testimony. Further, as explained in the Fourth Amendment analysis, exigent circumstances did not exist justifying the search.  Since Schuh and Broglin testified that they had no evidence that a minor was in danger, whether A.B., JB1 or JB2, their invocation of this

unwritten DYFS policy is questionable.  A rational factfinder
could conclude that this policy was not implicated by the
circumstances of this case since no minor was in danger from the
Plaintiffs.

Therefore, genuine issues of material fact exist which
preclude summary judgment as to the Plaintiffs First Amendment
claims against Schuh and Broglin.

### 2. Qualified Immunity

As explained above in Subsection III.B.4., qualified
immunity is a two part analysis:  First, "the officer's conduct
violated a constitutional right," and second, whether any such
constitutional right was "clearly established," and in
particular, "whether it would be clear to a reasonable officer
that his conduct was unlawful in the situation he confronted."
Saucier v. Katz, 533 U.S. at 201-02.  Specifically, a court must
focus on whether the particular application of law under the
circumstances confronting the officer were well established by
precedent, Ashcroft v. Al-Kidd, 131 S. Ct. at 2084-85.

Even if one assumes Plaintiffs have pled retaliation by
Broglin and Schuh for the exercise of free speech rights, this
court cannot find that any such right was well established such
that these defendants should have known their conduct was
unlawful under the First Amendment.  In this case, the Plaintiff
has pointed to no established case law finding a First Amendment

retaliation claim under factual circumstances that correspond even remotely to the instant matter and the Court has found none. Therefore, while a violation of Plaintiffs' First Amendment rights may have occurred, Defendants Broglin and Schuh are entitled to qualified immunity as it was not clearly established that their conduct was unlawful. Accordingly, Defendants Broglin and Schuh will be granted summary judgment as to Plaintiffs' First Amendment claim.[7]

### D. Injunctive Relief (Count V)

In order to establish a claim for injunctive relief in a federal forum, a plaintiff must show that he or she is likely to suffer future injury from the defendant's illegal conduct. As the Supreme Court has stated, "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983). Importantly, there must be "a showing of any real or immediate threat that the plaintiff will be wronged again - a likelihood of substantial and immediate irreparable injury." Lyons, 461 U.S. at 111. Finally, the relief requested must be able to redress the continuing adverse affects.

In this case, there is no evidence that Plaintiffs will be

---

[7] In light of the finding of qualified immunity, it is unnecessary to resolve whether the minor plaintiffs JB1 and JB2 lack standing to bring this First Amendment retaliation claim.

subject to future harm by Defendants Schuh, Broglin, Torres or McCloy. A.B. and JB1 are no longer minor children and are outside the purview of DYFS. There is no evidence that Schuh, Broglin, Torres or McCloy are assigned to any casework involving Plaintiffs. The Plaintiffs vaguely allege that Defendants could continue to harass and intimidate Plaintiffs without just cause. This vague statement is based purely on speculation and is contradicted by the record which is silent as to any untoward acts directed at the Bostroms after the evening at issue in December, 2006.

Plaintiffs allege they continue to suffer psychological injury as a result of the search of their home. This can be compensated through a damages award and would not be redressed by injunctive relief against the Defendants.

Therefore, summary judgment shall be granted denying Plaintiffs' claims for injunctive relief.

## IV. PLAINTIFFS' MOTION TO STRIKE PORTIONS OF REPLY [Docket Item 55]

After the Defendants filed their reply, the Plaintiffs filed a motion for leave to file a sur-reply and/or strike portions of Defendants' reply. [Docket Item 55.] The Plaintiffs also expressed concern with Defendants e-filing their exhibits and request that these exhibits containing private information regarding child abuse investigations remain under seal. The

Defendants have not filed opposition to this motion. For the reasons discussed below, the Court will grant Plaintiffs' motion to strike portions of the reply. In addition, the Court notes that the exhibits filed electronically were in fact filed under seal and are not subject to public viewing.

Defendants' reply contains two troubling sections that the Plaintiffs object to and should be stricken. First, instead of responding to Plaintiffs' 56.1 counter statement of material facts, the Defendants submitted a second 56.1 statement containing new facts which were not presented in the Defendants' moving papers. This is procedurally inappropriate and not permitted by L. Civ. R. 56.1. Therefore, Plaintiffs' motion to strike this portion of Defendants' reply will be granted.

Second, Defendants dedicate the first nine pages of their reply brief to arguing that the State is immune from liability under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1, et seq. First, this legal argument was not raised in the moving papers and was brought up for the first time in the reply brief. Second, and more important, is that immunity under the New Jersey Tort Claims Act is entirely irrelevant to the instant suit which was brought pursuant to Section 1983 and alleges constitutional violations, not tortious conduct, committed by the State Defendants.

Generally, a state statute cannot immunize government

employees from liability resulting from their violation of federal law. <u>Good v. Dauphin County Social Services for Children and Youth</u>, 891 F.2d at 1091; <u>Wade v. City of Pittsburgh</u>, 765 F.3d 405, 407-408 (3d Cir. 1985). As applied to the present case, it is well established that the New Jersey Tort Claims Act provides no immunity to public officers sued under federal law. The New Jersey Supreme Court has emphasized "that whatever the immunity conferred by the [New Jersey Tort Claims] Act, public entities and law enforcement personnel should understand that federal liability under section 1983 may exist, even if inconsistent with the Act, and if it does, the Act provides no immunity from the federal claim." <u>Tice v. Cramer</u>, 133 N.J. 347, 375 (1993). <u>See also</u> <u>Figueroa v. City of Camden</u>, No. 09-4343, 2012 U.S. Dist. LEXIS 121963, at *19 (D.N.J. Aug. 28, 2012)(Simandle, J.).

Therefore, as Defendants' belatedly raised New Jersey Tort Claims Act argument is of no relevance to the instant action which is brought solely under federal law, this portion of Defendants' reply will be stricken, and Plaintiffs' motion to strike is granted.

If the offending aspects of Defendants' reply are stricken, there is no need to permit a sur-reply and this aspect of Plaintiffs' motion will be denied as moot.

## V. CONCLUSION

For the reasons discussed herein, the Defendants' motion for summary judgment will be granted in part and denied in part. Summary judgment will be granted as to all claims against Defendants Torres and McCloy and these claims will be dismissed with prejudice. Summary judgment will also be granted as to Plaintiffs' Fourteenth Amendment claims and First Amendment claims against Defendants Schuh and Broglin. Finally, summary judgment will be granted dismissing Plaintiffs' claim for injunctive relief.

However, summary judgment will be denied with respect to Plaintiffs' Fourth Amendment claims against Defendants Schuh and Broglin, and the motion of Defendants Schuh and Broglin for qualified immunity on the Fourth Amendment claims will be denied.

Finally, Plaintiffs' motion to strike portions of Defendants' reply brief will be granted.

The accompanying Order will be entered.


**August 26, 2013**                          **s/ Jerome B. Simandle**
Date                                         JEROME B. SIMANDLE
                                             Chief U.S. District Judge